v. Daryl Jones, 23-1816. Ms. McKee, please submit that on the briefs to the Court for decision. And would you call the first case for argument? First case for oral argument on Thursday, October 19, 2023, case number 21-3454 and also case 21-3461, both from the District of North Dakota, United States v. Steven Pinto. Mr. Brennan. Good morning, Your Honors. May it please the Court, my name is Hank Brennan. On behalf of the appellant, Steven Barrows Pinto. The appellant's appeal focuses primarily on three central arguments. The first is that the venue in North Dakota was not appropriate. And I'll first argue with the Court's permission that venue is inappropriate and therefore the conviction should be vacated. I do recognize the government's brief, Smith v. United States, that the appropriate remedy is not at this point recognized as acquittal. Secondly, that the convictions for the 846 and the 963 are both duplicative. They both are lesser included offenses of the CCE 848 and therefore the Court should either vacate the convictions on the 846 and the 963 or vacate the conviction on the 848. And finally, we argue that the money laundering conspiracy, even under the plain error review if the Court accepts that, should be vacated because the indictment was unnaturally vague and did not provide the appropriate information to provide a fair notice and hearing and trial on the issues. If I may proceed, I'll begin with the first issue of venue. It seems that the evidence that the government would rely upon to show venue in North Dakota was wholly fixed to a drug deal between Mr. Cerrone, who is the distributor in Canada, and a gentleman in Portland, Mr. Hubbard, who then sent it to North Dakota to Mr. Jensen and ultimately to the consumer who died, Mr. Henke. Mr. Cerrone was dealing with Mr. Hubbard back in 2013 and 2014. The overt act at issue were December of 2015, pardon me, December 2014. They were then given to the deceased who died in January 2015. At this point, Mr. Pinto was not alleged to be part of any conspiracy, whether it's a single conspiracy or multiple conspiracy. He's not even on the map back in January 2015. After Mr. Henke's death, police then engage in undercover buys of Mr. Cerrone and he then sends drugs to North Dakota. The court was asked to give an instruction on multiple conspiracies, but more importantly, the defense asked the court to exclude any information or evidence regarding the North Dakota sale, the death of Mr. Henke, or any involvement in North Dakota. Thus, there'd be an absence of evidence to show venue. And over the defense objections, the court allowed the government to deduce tons, numerous witnesses, numerous pieces of evidence that had nothing to do with Mr. Pinto or his involvement in any conspiracy. The conspiracy is wholly separate because the supplier, Mr. Cerrone, was not interrelated or dealing with Mr. Pinto. He did not rely on Mr. Pinto or Mr. Pinto's associate, Mr. Gomes. In fact, testimony at trial, Mr. Cerrone concedes that the interaction with Mr. Harbord that led to North Dakota had nothing to do with Mr. Gomes or Mr. Pinto. They didn't provide any support. They didn't provide any help. They were of no knowledge of this totally and wholly separate conspiracy. How do we separate this one out from a lot of traditional drug conspiracies where the information as possible, just what you need, and that really in a lot of drug conspiracies we see come through the district court and appeal, people can't name the other folks that really are sort of indisputably a part of the same organization. What's the distinguishing factor or factors here that makes this case different? Given that there is Mr. Cerrone and Mr. Berry sort of at the top conducting their actions sort of in a similar fashion to Lupin, Mr. Harbord, and I think you pronounced Mr. Gomes, in the same fashion. There are two really distinct lines of demarcation that separate this conspiracy from a traditional chain conspiracy. I acknowledge that there is quite a lot of vagaries in conspiracies. What is different here? The first issue is that the distribution of the drugs that gives jurisdiction, that overt act between Cerrone, Berry, and Harbord occurs in December of 2014. Mr. Pinto was not even alleged to have begun distributing drugs until July of 2015, six months later. On that theory, would Mr. Gomes and Mr. Harbord, on your approach, be part of the same because of the timing? In other words, Mr. Pinto joins up with Mr. Gomes, not Mr. Harbord, but as I understood it, Gomes and Harbord join up at roughly the same period of time. Not to defend Mr. Gomes, but I do not see Gomes as part of the conspiracy with Mr. Cerrone and Mr. Harbord. One, because the timing is different. Mr. Gomes is involved with drug but there is absolutely no connection between the two. It's not simply they don't know each other's names. It's not simply that they didn't meet each other. These are two totally separate and distinct operations by Mr. Cerrone. Mr. Cerrone is dealing to Mr. Harbord wholly separately from Mr. Gomes and that's conceded. Mr. Gomes clearly in his testimony says, I knew nothing about North Dakota. The people in North Dakota, Mr. Harbord and Jensen, concede they know nothing about Mr. Cerrone's distribution network. Mr. Cerrone himself insists that Gomes or Pinto have nothing to do with his sale to Harbord. That first connection is not a link. It ends there. Equally importantly is that timing that Mr. Pinto is not even on the scene until July 2015. In July 2015, the government doesn't neatly define what his role is other than distributing pills. The interaction with Mr. Cerrone by sending legal fees, receiving imported drugs from China, that all happens later. There's a large amount of time. When we look at the totality of circumstances, there's a lot of guesswork in conspiracy cases but there's not a lot of guesswork about the fact that these are distinct and separate because the witnesses specifically testified to it and no facts support it. At no time in the trial could the government ever suggest that Mr. Pinto knew anything about North Dakota before his arrest. Nothing. Nothing about Mr. Cerrone's distribution network before he became involved with Mr. Gomes. Again, I don't think Mr. Gomes bootstraps that back in by saying he independently had some type of operation at the same time somebody else did. By that rationale... He knew that there, I mean, there was evidence that he knew that there was a network. He knew there was this supplier and that somehow someone was directing the drugs, the pills to be shipped to Gomes and Pinto, right? If we're referring to... Does it matter that maybe he didn't know identities? Not knowing identities really doesn't seem to be a strong big factor. That, I don't think, is the issue. If we're talking about before Mr. Pinto entered any conspiracy in July 2015, Mr. Gomes knew he was in a conspiracy with Mr. Cerrone and whoever the ultimate producer was, but that doesn't put him in a conspiracy with Mr. Hubbard in Portland as part of Cerrone's network. Mr. Pinto, his connection is even more absent. He is not in any conspiracy whatsoever prior to July 2015. At any time before his arrest, he knows nothing about North Dakota. The government could not produce any evidence of any knowledge, agreement, interaction, interdependence between Mr. Pinto and Mr. Cerrone as it relates to Mr. Hubbard. If Mr. Pinto is not part of the conspiracy, doesn't know anything about it, never learns anything about it, and that should not have been admitted as evidence at trial, there would be no venue issue for the jury to have considered. Venue wouldn't have existed. This would have been a case in North Carolina or Rhode Island. Was there evidence that Gomes told Pinto that their source was in Canada? A witness... And in Panama. There are three witnesses who testified that after July 2015, that Mr. Pinto became aware that the source was generally from Canada. There is no doubt that there was evidence at this trial long after the Cerrone-Hubbard connection, because Hubbard is now arrested in January 2015, long after he learns that generally there is a connection in Canada. I am not disputing that Mr. Pinto distributed drugs and that he was in a conspiracy with Mr. Gomes and that he was in a conspiracy with the supplier. Even though he didn't know Mr. Cerrone's name, but he's part of that conspiracy, no doubt. And then the unknown person who was distributing from China, he's part of that conspiracy as well. I concede that, but he's not part of the Berry or Cerrone-Hubbard network. He has nothing whatsoever to do with it. There's not even an inference in the evidence. In fact, the evidence is all opposite. Counsel, quickly, it's a preponderance standard, right? It's a preponderance for the jury. However, the judge, respectfully, great respect for the judge, made error in even allowing the testimony in to begin with. So it's not simply an analysis whether the jury could have met that preponderance standard. Clearly, the jury couldn't have because there's no overt act that... And then this doesn't affect count six, right? It doesn't. I think I argued in my brief that it did. I concede that I overreached on that. Can I back up on the preponderance of the evidence issue? So if the district court denies the motion, your motion on venue and sends it to the jury, what... And isn't your argument about the evidence that should not have been admitted at trial just simply directly linked to the venue issue? In other words, it still remains preponderance to Judge Benton's question? I'm not sure I understood your answer that there's a distinction in the standard. So the judge, I believe, independently can assess whether venue was proper and he denied my motion. It is not solely a jury question, although the cases have said that a jury can consider this, a judge can have a jury consider this in the standards of preponderance of the evidence. A judge still could have excluded all of the 404B evidence that never should have come in if it wasn't relevant. A judge still could have given Mr. Pinto a required finding of not guilty on the venue issue, despite the fact that the jury... And what standard would the district court apply there? Are you suggesting it's different than what the jury would have applied? Well, I objected virtually to everything in this case from the beginning. Pretrial, during every witness, as carefully as I could. So I think the standard is not plain error. No, I'm sorry, not our review. I apologize. When the district court's reviewing your motion, and you're saying, well, the district court could have ruled and excluded this evidence, I guess my point is, how is the district court, in your view, looking at that? Is it considering it, well, by a preponderance of the evidence? Or what is the district court applying in your argument? I haven't found a case specifically on point what that analysis should be. So, frankly, I don't know. I'm sure Your Honors do. I don't. But at the very least, even if the court used a preponderance of evidence standard, this wasn't a debatable amount of evidence where there are two sides, and it was the weight of the evidence. It was an absence, a clear absence of evidence. So it doesn't matter, from our perspective, what standard is used. Any standard would be enough. If there are further questions on this issue, I'm more than eager to answer them. Otherwise, I'll move on to the next issue. I'd like to move on to the double jeopardy issue. I see that as more important at this stage. Respectfully, the government concedes that there is a lesser included of the 846. I appreciate that acknowledgement. Now, is the appropriate response for us to do something or leave it to the district court's discretion? I think that the Between counts 1 and 2. I think that the court should vacate count 2 as well. And here's why. Sorry, I said it wrong. When we're looking only at 1 and 3. I believe that the court vacates count 1 and then sends it back to the district court for resentencing. Okay. I'm asking the court to also vacate count 2. Yes. But before we leave 1 and 3. I'm sorry. No, no. Before we leave 1 and 3, you read our cases to say that we have no role in deciding once we say it's a lesser included offense. As you all agree, we have no role. We leave it to the discretion of the district court, which one they do, 1 or 3. I don't want to be presumptuous and say what your court's role is. But I think that what I What do you think our cases say our role is? That's what I'm trying to say. I think your cases say that it's supposed to be sent back to the trial judge and that he can make the assessment before or after. And having not made it before, he makes the assessment after the count is vacated and then decides. Of course, if he takes away 3, then you've got no argument on 2, right? That's where I'm going. Yes. If he takes away 3, I think 1 and 2 stand. If he takes away 1, I think he also needs to take away 2. And so I think either 1 and 2 should remain or 3. And the reason why Does 2 depend on how this was charged and how it was tried to the jury as opposed to some theoretical comparison of the statute? I think how it was tried to the jury is the most compelling factor. And not even how it was charged. Some of the cases read like it has charged. The charge itself raises concerns and support for my argument as well. The government points to the fact that it specifically articulates that the jury must find the person to be guilty of count 1, which is the distribution. But the language it uses, I think, is very immersive. Not in the indictment. It says, in 846, including but not limited to violations alleged in the preceding indictment. That could mean anything. So while it specifically articulates count 1, it doesn't preclude count 2 as part of the jury's consideration. It says the above described violations and it doesn't say what they are. It just says count 1 and then include but not limited to other violations alleged. Now in this case, the evidence was admitted and there was never any instruction to separate the evidence. In fact, the evidence really merged between importation and distribution. Notably if you look at the government's closing, the government argues a number of people who could be the predicate for underlings in the CCE and they name about 10 people. They name people who were involved in importation and in distribution. For example, they named Jennifer Camara, who was the girlfriend of Mr. Pinto. She received a box from China. She had no other relevance in this case, nothing to do with distribution, but she is a witness to the importation. They specifically name her as one of the people in the CCE. Is this their argument, counsel? In closing argument, it demonstrates how confusing the evidence was at trial where they blurred all of the evidence between importation and distribution. I think based on their indictment and based on the jury instruction, it wasn't limited to simply distribution. They articulated distribution but they did not limit it in any way so the jury was free to consider any of the evidence under CCE for any of the factors and I think they did. So I think because of that, because the indictment and instructions were not specific enough and because of the way the government tried the case by blurring the evidence, I think both count one and count two, you can't distinguish between the two of them. I do have two and a half minutes. At two minutes, I would ask the Court if they are inclined to allow me to save that two minutes for rebuttal. You certainly may. I'll mention just with my 26 seconds the issue of the money. I thought you were doing it now. Go ahead. Watch the clock. The money laundering indictment, I'll simply iterate my arguments in that it doesn't provide specific notice. It allowed the government at trial to basically rove into what the money laundering was. There certainly was a tremendous amount of evidence of money laundering during trial but it was never articulated with whom and what it was. So even as I stand here today, I can see there was ample evidence of money laundering but what the indictment was charging him with, I don't know. And what evidence was used to support that conviction, I don't know. And so inevitably, does Mr. Pinto stand in a position where he could be then charged again? Is double jeopardy implicated? Did it include the money in his parents' wall that was found after the indictment? They used that for money laundering as consideration for conviction but had nothing to do with the indictment because it was never supplemented. And that's my argument, Your Honors, and I'll reserve the minute and 24 seconds, if I may. Thank you. You certainly may. Ms. Ellickson. Good morning, and may it please the Court. Jenny Ellickson for the United States. I'd like to start with the venue issue. First of all, I think that the single distribution in December or January 2014 or January 2015 from Oregon to North Dakota would have been enough for a venue, even though Mr. Pinto joined the conspiracy later. But to be clear, that was not the only connection that this case had to North Dakota because later in mid-May 2015, after Hubbard, the West Coast part of the operation, had been arrested, after an undercover agent took over his online identity and was communicating with Cerrone, they negotiated an additional importation of fentanyl into North Dakota. That package arrived in North Dakota in mid-May, and the evidence also allowed the jury to find that Pinto was a member of the conspiracy at that point. How do you factor in that that was conducted by an undercover agent, that that wasn't a member of the conspiracy who sent in something to North Dakota? Is that grounds for venue? Well, it was Cerrone who handled the importation. It was that he had negotiated it with the undercover. So yes, there was impetus from the undercover to have it, but it shows that Cerrone, from his perspective, that an importation into North Dakota was part of what he was doing. Does it matter whose idea it was to send it to North Dakota? I just found that curious, that an undercover agent's actions directed at one location could establish venue, and I had never thought about it before. Yes. Well, it isn't the only thing that we're relying on here. We are also relying on the earlier distribution, which is why the case was already of pre-existing interest to North Dakota. If there, you know, I think it might be a little bit, it would be an interesting question if there had been no connection to North Dakota before that, and an agent, an enterprising agent in North Dakota decided, you know, I want to make this a North Dakota case. Because it wasn't Cerrone who, Cerrone sent it to Hubbard, who then sent it to North Dakota, right? So that would have been Cerrone's first, as far as the evidence goes, the first time he would have shipped into North Dakota. Yes, that's correct. That's correct. But I think if you, you know, look at the evidence, what the jury could reasonably infer from the evidence is that Cerrone just wanted to get these drugs into the United States. He viewed the United States as a very profitable opportunity for fentanyl sales, and he was looking for people in the United States to get the drugs to and to, you know, distribute it in large quantities, and he succeeded in that. And so, I think from his perspective, North Dakota, Oregon, Rhode Island, Florida, it's all one and the same. What he wanted, what the goal of the conspiracy was, was to get this fentanyl into the United States and to distribute it. So, yes, and I think, but more generally, the idea that Mr. Pinto had to be part of the conspiracy at the point when the North Dakota actions happened, you know, that's not the way this type of conspiracy law works, because if you join an to the agreement, and you are kind of, you know basically the general contours of what you're getting into, and you are then responsible for everything that the conspiracy did before you joined, maybe not the substantive things in a Pinkerton way, but with respect to the scope of the conspiracy. Isn't this a little bit different, though, when you're talking about basically coastal activity, you know, one coast to the other? Usually when we're talking about a conspiracy, and you don't need to know the names or the identity of other folks, but you generally understand a regional operation and what's going on. And this, because it's on the internet, and anybody could sign up, sort of the idea that you would think through this notion of somebody on the west coast doing similar conduct, it has a different feel, maybe because of the internet, maybe because of the vast geographical separation between these folks. Can you speak to that? Sure, sure. And one point that I also want to make is that these operations, at least in Cerrone's mind, were one and the same, because during conversations again with the undercover agent, he actually mentioned to the undercover agent in connection with the North Dakota purchase, he said this shipment is going to be coming from Canada, but I have 300,000 pills in the United States, and if I send you future shipments, they're going to be coming from the United States. And he was referring, he later testified, he was referring to Gomes' manufacturing on the east coast. So from Cerrone's perspective, these were unified. This was kind of all a single operation. From Pinto's perspective, I think Pinto knew that this was a large in scope geographic operation. Pinto himself was distributing pills down to North Carolina. He knew that Gomes was doing it in Florida. Eventually Pinto developed a Minnesota connection, which he told one of his inmates, his fellow inmates about, where there was somebody he knew in Minnesota who he had started to send pills to as well. So I don't think this is a circumstance where Pinto was, you know, the jury would infer Pinto only wanted to do a local operation. It's clear that Pinto was interested as well in the conspiracy's goal of this operation having a broad geographic sweep. He may not have known that it had gone specifically to North Dakota, but he didn't have to know that. He knew the scale in a general fashion of the operation, and in fact tried to build it out further himself. So I think that indicates that he was not kind of analogous to a local street level dealer who was operating only in a single city. He himself was operating in a very large area. Counsel, how long in months was it between the control buy in 2014 and when Pinto joined the conspiracy in the government's view? So the control buy was in mid-May 2015, and transcript page 1429 is when Gomes talks about his recollection of when Pinto joined the conspiracy, and what Gomes says is he recalled that it was early 2015, and he said definitely before June of 2015 because, and I think he elaborates on this in his testimony, he remembered that Pinto's birthday was in June of 2015, and Pinto was already by that point celebrating the So I think the jury could infer from the fact that Gomes said that Pinto was involved by early 2015 and before June of 2015, that by mid-May 2015 when this control buy happened, that Pinto had already joined the trafficking operation, and of course his own activities increased. He became more seriously involved as time went on, and he was personally, you know, we've been talking a lot about the distribution, but there's also the importation piece of this, which is another factor that distinguishes this from a regional, you know, local drug dealing operation. Pinto was personally, you know, facilitating the importation and, you know, encouraging the importation of kilogram quantities of fentanyl from China, knowing that they were coming from China and that their supplier who was connecting them had been originally based in Canada. So this is not a small-scale operation. This is a, he knew that he was getting involved in a fully international operation. I'm happy to answer further questions about the venue, but if the Court has no more questions on that point, I can move on to the double jeopardy issue. So with respect to counts one and three, we've conceded that those are duplicative for purposes of the double jeopardy clause, and so it would be appropriate for this Court to remand to the District Court with instructions to dismiss one of those counts, and I think that's what this Court's precedent indicates would be the appropriate remedy. The District Court can, you know, assess and determine, you know, which count is appropriate to vacate based on its standpoint as the sentencing judge. With respect to count two, though, that count was charged, that was not one of the, that was not a basis for count three, the continuing criminal enterprise count, because the indictment specifically said, and I have it in front of me, it charged Mr. Pinto with engaging in a continuing criminal enterprise by violating at least a including but not limited to the violations alleged in count one of the indictment. The above described violations were and are part of a continuing series of violations. The violations, I think when it says the above described violations, it's referring to that paragraph where it says that he violated Title 21 United States Code sections 812, 813, 841A1, and 846. Those are all distribution, that's the, those are distribution offenses. And that, that's also what the District Court's instructions required the jury to find. It said you have to find that he. What about your opponent's argument that that's not true of the jury instructions? I heard that from him. Yes. Now, the jury instructions also required, required the jury to find that he was guilty of count one for the CCE. There was no requirement that the jury find that he was, he had committed, he had conspired to import drugs. It said that he had to, he had to violate count one. And I, I can pull up the language of that instruction as well if the Court is interested. Yes, please. Yes. So it says, this is on page 15 of the instructions. The, the first thing that the jury had to find is that the defendant committed the offense charged in count one. And then two, the offense was part of a continuing series of three or more related felony violations of the Federal Controlled Substances Act. But it didn't, but that did not require the jury to find that the violations were importation offenses. And it is true that some of the conspirators involved in this were involved in importation. But the importation and the distribution activities were sort of hand in glove. One couldn't happen without the other. You needed to get the drugs in order to be able to distribute them. In this case, they were getting the drugs through importation. And so, but they were then distributing the drugs. So, so a co-conspirator who helps with the importation is also facilitating the distribution by helping to procure the drugs that they can distribute. So I don't think that there is, there is a clear line between this. And in fact, in the Supreme Court's decision in Alberniz, the Supreme Court says you can have a single agreement to both import and distribute. And that can be basically one agreement. But Congress has decided to charge those in separate statutes. And that they, and the statutes are okay for double jeopardy purposes, because each requires proof of a fact that the other does not. To commit a conspiracy to distribute drugs, you have to agree to distribute them. And for importation, you have to agree to import them. And those are not, you don't have to prove that for each of the other, even though it may be the same overall agreement. So I think that even though there is a factual overlap in the proof here, it's not an overlap that actually goes to the double jeopardy analysis. I'm also, I'm happy to answer further questions on that issue, but I can also move to the sufficiency of the indictment. So this, as a threshold matter, I think we view this claim as waived, because Mr. Pinto did not make a pretrial motion to challenge the sufficiency of the indictment. He did not request a bill of particulars. He didn't raise any complaints about the indictment in the district court proceedings, at least not the complaints he's raising here. Is that an open question in this circuit? Yes. This Court has issued decisions both ways. And so I recognize that this Court Well, the Pickens, I was quoting the Pickens case. Yes, exactly. And this Court has recently recognized that it has decisions going both ways. We think that, as the Court indicated in Pickens, that waiver is the better way of looking at it. But I recognize that this Court has decisions that have gone the other way. And so it would be Can you reconcile them with some sort of good faith or good, I'm sorry, I said the wrong thing, good cause, a sort of showing requires, something like that? I, you know, I'm not sure if that answers all of the, I'm not sure that all of the plain error cases did a good cause analysis. There may have been kind of more of an, you know, atmospheric good cause in those cases than there was here. So that might be a way to distinguish them. But even if this Court goes the route that the Court went in Pickens and says, you know, we realize we have cases going both ways, and so we'll just, you know, say, even though we think waiver is the better answer, we'll apply plain error review, certainly we think that we prevail on, we easily prevail on plain error review. The focus of Mr. Pinto's complaint is the idea that the indictment was insufficient because it failed to identify his money laundering co-conspirators by name. But he hasn't pointed to a case, and I'm not aware of a case, where a Court has said that that's something that must be, must be included in a money laundering conspiracy indictment. And so absent case law like that, I don't think there's any way to, that he can or has satisfied the requirement of plain error review that it be a clear and obvious error. I think we also believe it's not an error at all because, in fact, this Court has issued cases in the drug conspiracy context that make it clear that you don't have to name your, the conspirators for an indictment to be sufficient to put the defendant on notice. And we also think we prevail on the third and fourth prongs of plain error review. Mr. Pinto was clearly prepared to answer the allegations at trial. He put on a vigorous defense. He hasn't identified any way in which his concerns about the indictment might have prejudiced him. So I'm happy to answer further questions about that or any of the issues. Further questions? Further questions? No. Thank you for your argument here today. Thank you very much. And we ask that the Court remand on the count one and three issue, but otherwise affirm. Thank you. Thank you, Ms. Ellickson. Mr. Brennan. Thank you. From Boston, I speak very quickly. I'm going to try to speak even more quickly, so my apologies. The control by is in May 2015. This is before anybody says Mr. Pinto was involved in a conspiracy or was selling pills or had any involvement whatsoever. May 2015. The government looks at the June 2015 testimony on cross-examination. Gomes is unsure. Said it might have been around July. Either way, after May. And so the point that you raise is something that I considered strongly during trial. It seemed as though law enforcement manufactured Venue in this case because they didn't have it and all the resources were here. That's why Venue's important. It takes somebody from their home, from their resources, puts them in a different part of the country where they might not be acclimated, they might be seen as differently. That's the danger of Venue. That's what they did here. And there's no connection to Mr. Pinto. There's no doubt he was in a large-scale operation, but it was for him running down. Just like I asked Mr. Hubbard, did you ever get charged up? Did you get charged with Saron's crimes with other people? And everybody answered no. They got charged down. Everybody did except for Mr. Pinto. He got charged up for something he wasn't involved in. There was no agreement. There was no agreement. We can talk about the size of it, the depth of it, the dangerousness of it. There was never an agreement with Pinto to have an understanding or agree with Saron to distribute with anybody he was receiving and he was selling. Thank you for your time, Your Honors. And before I forget, thank you for your service and acceptance of the appointment under the Criminal Justice Act. My pleasure. Okay. Case number... Sorry, cases. The two cases, 21-3454 and 21-3461, are submitted for decision by the Court.